[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-11365

_____

D.C. Docket No. 5:18-cv-00277-TES

STEWART J. SMITH,

Plaintiff-Appellant,

versus

UNITED STATES OF AMERICA,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(July 29, 2021)

Before WILSON, ROSENBAUM and HULL, Circuit Judges.

HULL, Circuit Judge:

In 2018, Mr. Smith, a veteran, initiated this lawsuit in federal district court

against the United States, proceeding under the Federal Tort Claims Act

("FTCA"), 28 U.S.C. § 1346(b). Mr. Smith claimed, in part, that various medical professionals working for the Department of Veterans Affairs (the "VA") breached their legal duty to exercise ordinary medical care and negligently failed to diagnose his throat cancer and immediately treat it. The district court granted the government's motion to dismiss Smith's complaint for lack of subject matter jurisdiction. The district court concluded that its judicial review of his claims was precluded by the Veterans' Judicial Review Act ("VJRA"), 38 U.S.C. § 511(a), which restricts judicial review of "questions of law and fact necessary to a decision by the Secretary under a law that affects the provision of benefits by the Secretary to veterans." 38 U.S.C. § 511(a).

After review, and with the benefit of oral argument, we conclude that the district court did lack jurisdiction over some of Mr. Smith's claims, but that it had jurisdiction over his tort claims alleging medical negligence or malpractice. We thus affirm in part and reverse in part the dismissal of Mr. Smith's complaint.

## I.  SUBJECT MATTER JURISDICTION

All agree that the government's attack on the district court's subject matter jurisdiction is a factual—as opposed to a facial—one. The parties submitted, and the district court properly considered, evidence relevant to the court's jurisdictional inquiry. See Morrison v. Amway Corp., 323 F.3d 920, 924 n.5 (11th Cir. 2003) ("In resolving a factual attack, the district court may consider extrinsic evidence

such as testimony and affidavits." (citation omitted)).  Therefore, in recounting the basic facts, we rely on material outside the operative complaint, including depositions, affidavits, and medical records.

## II.  VETERANS' HEALTH CARE

The VA provides medical care to veterans through the Veterans Health Administration ("VHA").  The Secretary of Veterans Affairs (the "Secretary") manages the provision of health benefits to eligible veterans.  See Veterans Health Administration, About VHA, https://www.va.gov/health/aboutvha.asp (last accessed July 29, 2021).  Dr. Robert Ferris, an expert witness retained by Mr. Smith, testified that the standard of care for medical treatment received through the VA is no different from the standard of medical care that applies throughout the United States.[1]  See Anestis v. United States, 749 F.3d 520, 527 (6th Cir. 2014) (noting a veteran's widow's claims of malpractice by VA hospital staff were "based on standards of care that govern medical professionals" generally).

The VA provides medical care to veterans by two means: (1) by providing care directly through the VA's own medical professionals and their supporting personnel; and (2) by paying medical-care providers in the local community outside the VA when veterans need care that cannot be provided within the VA

---

[1]As part of the limited initial discovery in this case, Mr. Smith had expert reports prepared by a physician, Dr. Ferris, and a nurse, Karen Rose.  The United States deposed both experts prior to filing its motion to dismiss the complaint.

3

system.  See Community Care, Veterans Overview, https://www.va.gov/ communitycare/programs/veterans/index.asp (last accessed July 29, 2021).

As to outside treatment, the medical care is arranged through a purchased-care model where the VA must authorize the outside treatment in advance.  See 38 U.S.C. § 1703.  The VA's approval process for outside care has two components: (1) administrative review; and (2) clinical review.  The process begins when a VA provider (such as a doctor) completes, signs, and submits a non-VA care referral through the VA's Computerized Patient Record System.  Members of the VA's Care Coordination Team then perform an administrative eligibility review to determine whether to approve the outside care.  The administrative review involves determining whether the patient is eligible as a veteran to receive VA benefits.

The VA's Care Coordination Team also performs a clinical review.  That clinical review—which cannot occur unless the patient is administratively eligible—concerns whether, for example, the services are available within the VA and whether the outside services are medically necessary.  While the eligibility review may be conducted by someone acting in a solely administrative role, the clinical review is conducted often by a nurse, sometimes with the oversight of a doctor.  The "referral review process" is complete once the referral is approved or denied.

Here, both the administrative and clinical review were performed by Nurse Nkechi Ekwueme ("Nurse Ekwueme"), who was the VA's Care Coordinator for Mr. Smith. After the outside medical care is approved, another VA employee schedules the appointment with an appropriate outside care provider.

The VA's Care Coordinator has another substantive role in a veteran's medical care. Nurse Karen Rose ("Nurse Rose"), another expert witness retained by Mr. Smith, testified about the functions of a VA nurse care coordinator and whether Nurse Ekwueme acted "within the standard of care for nursing care coordination" throughout Mr. Smith's care.[2] In particular, Nurse Rose, a registered nurse with VA work experience, opined that one of the primary functions of a VA care coordinator was to "[t]rack and monitor" the patient's medical care and treatments throughout the time he is receiving outside VA care. According to Nurse Rose, Nurse Ekwueme was responsible for, among other duties, managing, coordinating, and monitoring the medical consultation and

---

[2]Nurse Rose's past employment included positions as a "Nurse Case Manager" at Fort Bliss, Texas, a case manager for high-risk patients within the VA, and an "Alternate Traveling Veteran Care Coordinator." In these positions, Nurse Rose was involved in coordinating care for soldiers and veterans, including "facilitating care . . . with outside facilities." Nurse Rose based her opinions in part on the "Case Management Society of America Standards of Practice" (which lays out "standards of practice for all case managers who coordinate care") as well as her education and work experience.

5

treatment Mr. Smith received from an outside ear, nose, and throat ("ENT") specialist, Dr. Sanford Duke.[3]  We now detail Mr. Smith's medical care.

### III.  MR. SMITH'S CANCER

Mr. Smith is a veteran of the U.S. Army who served during the Vietnam era. In 1972, he was honorably discharged, and, since then, he has received medical care through the VA.  Since 2004, Mr. Smith has received medical care at the Carl Vinson VA Medical Center in Dublin, Georgia (the "VA Medical Center").  At the relevant time, Mr. Smith's primary care physician was Dr. Neelima Puppala, an inside VA care provider.

### A.    October 2013: Emergency Room

On October 24, 2013, Mr. Smith called the nurse triage line at the VA Medical Center and reported severe pain in the right side of his head, particularly behind his ear and eye, accompanied by tongue swelling that caused his speech to be slurred.  A VA nurse relayed a message to Dr. Puppala and directed Mr. Smith to the emergency room.  That day, Mr. Smith sought care at the Coliseum Medical Center Emergency Department ("ER") in Macon, Georgia.  The ER physician,

---

[3]According to the VA's "Process Guide" for Non-VA Care Coordination, "Non-VA Care Coordination activities . . . continue through the episode of non-VA care."  During this time, it may be necessary for the Care Coordinator to generate progress notes to "coordinate, facilitate, and document support services required by the Veteran."

believing Mr. Smith's symptoms were an adverse reaction to Neurontin, instructed him to stop taking Neurontin and to follow up with his VA physician.

The very next day, October 25, 2013, Mr. Smith contacted Dr. Puppala's office, but he was unable to secure a VA appointment with Dr. Puppala until December 16, 2013—nearly two months later.

**B.    December 2013–January 2014: Diagnosis and CT Scans**

At the December 16 appointment, Mr. Smith reported to Dr. Puppala, his VA doctor, that his tongue had remained dry and swollen since the October 24 ER visit and that the right side of his neck had begun to swell in the weeks prior to this appointment. Dr. Puppala noted the ER evaluation, examined Mr. Smith, and confirmed the right "submandibular gland swelling." Dr. Puppala ordered CT scans without contrast of Mr. Smith's neck. The VA scans, however, did not occur until over a month later, on January 14, 2014.

Predictably, the January 14 CT scans showed a tumor in Mr. Smith's throat at the base of his tongue. At that point, the tumor had spread to three lymph nodes in his right neck. According to the VA radiologist's report, the CT scans showed "an enlarged mass or lymph node" in Mr. Smith's right neck, "abnormally enlarged and irregular appearing lymph nodes" also in his right neck, and "[q]uestionable increased soft tissue density in the right base of [his] tongue."

Dr. Ferris testified that, given the extent of the swelling in Mr. Smith's neck and the undisputed presence of a mass in his neck, there was a "joint duty on the part of the [VA] physician and radiology" teams to get Mr. Smith in for CT scans "[w]ithin days, a week at the most" of his December 16 visit and to then assess the results quickly to arrive at a diagnosis. According to Dr. Ferris, the urgency of Mr. Smith's condition ought to have been apparent, since "a neck mass in an adult is cancer until proven otherwise."[4]

Dr. Ferris opined that "Mr. Smith had initial symptoms of tongue malignancy in October 2013 and there were obvious findings of his tongue cancer on the CT scans on January 14, 2014." Dr. Ferris also testified, based on his review of the January 14 CT scans, that Mr. Smith "appeared to be clinical stage IV," given that there were "two or more metastatic lymph nodes" and also "a large tumor at the primary site." Even the VA radiologist noted that the January 14 scans were "worrisome for underlying head and neck malignancy"—cancer.

Despite all this, the VA radiologist, Dr. Matthew Dobbs, only recommended an outside "ENT consultation and visual inspection and possible PET/CT for biopsy of these nodes." Dr. Ferris opined that, "[h]ad Mr. Smith's malignancy

---

[4] Dr. Ferris is a medical doctor licensed to practice medicine in the State of Pennsylvania. He holds a medical degree from the Johns Hopkins Medical School, and is board certified in otolaryngology. Since at least 2002, Dr. Ferris had been regularly engaged in the active practice and teaching of otolaryngology, immunology, and head and neck oncologic surgery.

been diagnosed in January 2014, as it should have been, it is more likely than not that the malignancy could have been resectable at the time."

Upon receiving the CT scans on January 16, 2014, Dr. Puppala informed VA personnel that Mr. Smith needed another appointment with Dr. Puppala "ASAP" to discuss the results. Receiving this ASAP direction from Dr. Puppala, VA personnel promptly scheduled Mr. Smith for an appointment a week later, on January 22, 2014, with Dr. Puppala. Apparently, when the VA doctor orders it, VA personnel can act and schedule quickly.

Even before seeing Mr. Smith for the January 22 follow-up, Dr. Puppala, like the VA radiologist, recommended and ordered a "non-VA consult" for Mr. Smith with an ENT specialist and entered a "Non-VA Care Coordination Note" into Mr. Smith's treatment record requesting the outside ENT consult. Although there were "obvious findings of [Mr. Smith's] tongue cancer on the CT scan[s] [on] January 14, 2014," no medical person on Mr. Smith's medical team ordered, requested, or tried to facilitate an immediate or expedited consult.

At the January 22 follow-up appointment, Dr. Puppala discussed the CT scans with Mr. Smith. Although the primary purpose of the visit was to discuss the scans, Dr. Puppala noted that Mr. Smith still had swelling on the right side of his neck and that the swelling was now causing pain in his right ear. Given Mr. Smith's continued symptoms and the "worrisome" findings of "head and neck

9

malignancy" on the CT scans, Dr. Puppala entered another Care Coordination Note ordering an outside ENT consult.

As detailed above, once Dr. Puppala ordered the outside ENT consult, a VA Clinical Care Coordinator, here Nurse Ekwueme, was responsible for conducting an administrative and clinical review of Dr. Puppala's ENT consult order to determine Mr. Smith's eligibility and approve the ENT consult. Mr. Smith's treatment record indicates that on January 24, 2014, two days after Dr. Puppala entered the second Care Coordination Note, Nurse Ekwueme approved the ENT consult. Specifically, Nurse Ekwueme made a note in Mr. Smith's treatment record that the ENT consult Dr. Puppala ordered was "authorized by Fee," and the consult was given to the Fee PSA (Program Support Assistant) for processing. On the same day, the Fee PSA acknowledged receipt of Nurse Ekwueme's authorization note.

In short, as of January 24, 2014, the VA had completed its administrative and clinical review and determined that Mr. Smith was eligible for an outside ENT consult and that the consult was medically necessary. There was no benefits issue as to the outside ENT consult then or at any time.

## C.    January 24–March 11, 2014: No Medical Follow Up on Outside ENT Care

Despite the obvious findings of tongue cancer shown in the January 14 CT scans and the urgency of Mr. Smith's cancer condition, the VA's medical staff

10

took no further action for almost a month.  There is no indication in the record of any management, coordination, monitoring, or follow-up as to Mr. Smith's medical care by any of his VA medical professionals or their supporting personnel.

It took until February 21, 2014, for the VA to even send information to the ENT Center of Central Georgia, an outside private medical group.  This one-month delay was not due to any dispute about whether Mr. Smith was entitled to benefits. To the contrary, once Nurse Ekwueme indicated in the treatment record on January 24 that Mr. Smith's outside ENT care was approved, there were no concerns with whether Mr. Smith was eligible for the outside medical care ordered by Dr. Puppala or whether that outside medical care was medically necessary.

Meanwhile, the private clinic, the ENT Center of Central Georgia, informed Mr. Smith that they were still awaiting notice of the VA's approval for his visit.  It appears that despite the indications in the VA record that the outside care was already approved, the ENT Center had not yet received anything from the VA. Again, from January 24 to March 6, there appears to have been no medical follow up or care coordination by any VA medical professionals or their supporting personnel.  So, on March 6, 2014, Mr. Smith contacted the VA Medical Center about his outside ENT consult.

In response, VA Nurse Ekwueme, as Care Coordinator, intervened the following day.  On March 7, Nurse Ekwueme faxed an authorization to the private

11

ENT Center and scheduled an appointment for March 11, 2014, almost two months after the January 14 CT scans and almost three months after Dr. Puppala examined Mr. Smith on December 16. The private ENT Center saw Mr. Smith promptly on March 11. In fact, once the VA faxed the authorization on March 6, the ENT specialist saw Mr. Smith a mere five days later (March 11). If anything, this again demonstrates how the VA's medical personnel are able to get a VA patient with serious cancer seen immediately and are able to manage and coordinate medical care.

At the March 11 appointment, Dr. Sanford Duke, the private ENT, examined Mr. Smith and confirmed he had a palpable mass on his right neck and the base of his tongue. Mr. Smith again presented with symptoms including dysphagia (difficulty swallowing), dry mouth, mucous after drinking, and affected speech. After reviewing the January 14 CT scans, Dr. Duke immediately performed a fine needle aspiration of the mass for pathological examination. Predictably, the pathology results indicated "Malignant Cells present, poorly differentiated carcinoma"—cancer.

Two days later, on March 13, 2014, Dr. Duke saw Mr. Smith again, at which point he advised Mr. Smith that he needed immediate surgery for his cancer. Dr. Duke noted the need for a set of scans with contrast and a PET scan before he could surgically remove Mr. Smith's tumor. VA policies and procedures,

12

however, required that the scans be performed back at a VA facility. Again, there is no dispute that Mr. Smith was eligible for these scans and that they were medically necessary.

## D.    March 13–April 24, 2014: No Medical Follow-Up on PET Scan

Despite the urgency and seriousness of Mr. Smith's cancer diagnosis and the need for immediate surgery on March 13, the VA medical team did not manage, coordinate, monitor, or follow-up as to Mr. Smith's medical care. Rather, it took weeks to do the new scans. The CT scans with contrast were not performed until March 28, 2014, over two weeks after they were ordered, and the PET scan was not done until April 7, 2014, over three weeks after it was ordered.

The CT scans with contrast showed enlarged nodes in the right neck and a questionable soft tissue density in the base of the tongue. But, as of April 14, 2014 (a month after the scans were ordered), Mr. Smith still did not have the results from the PET scan, so he called the VA Medical Center.

On April 24, 2014, Mr. Smith emailed Dr. Puppala about his "serious malignancy," stating that he had not received the results of the April 7 PET scan:

> I am very concerned about the cancer on my neck and tongue that you and the radiologist diagnosed in January 2014. I had experienced symptoms of ear pressure, headache, and problems with movement of my tongue since about October 2013. It is now almost May, and I have not been contacted by . . . [the VA Medical Center] . . . with an interpretation of my PET scan results . . . . And since Dr. Dukes' [sic] office has informed me that VA has not authorized him to provide further care (presumably surgery and radiation), I have a serious

13

malignancy but do not yet have a plan of care from any medical professional at VA. Am I missing something here, or is treatment of my cancer not an urgent matter?

### E.    April 25, 2014: PET Scan Results

On April 25, 2014, apparently in response to Mr. Smith's email, Dr. Puppala noted the findings of Mr. Smith's PET scan and stated that Mr. Smith needed to "follow up with [his] ENT . . . who requested the PET scan." Consistent with the January 14 CT scans, the PET scan showed evidence of a primary malignancy of the tongue, as well as evidence of right cervical lymph node metastases.

That very same day, Dr. Puppala also called and emailed the VA's fee department to gain approval for Mr. Smith's follow-up care—including surgery to remove his throat tumor—with Dr. Duke. According to the notes in Mr. Smith's patient record, Dr. Puppala was unsure why Mr. Smith's follow-up with Dr. Duke needed approval, since "[u]sually the consutls [sic] we submit are approved for a year." Dr. Puppala herself stated that the VA (specifically the "fee dep[artmen]t" where Nurse Ekwueme worked) should have been coordinating with the private ENT center to set up Mr. Smith's follow-up appointments with Dr. Duke. Unfortunately for Mr. Smith, this apparently did not occur between March 13 and May 13.

**F.    May 19, 2014: Surgery**

It was not until Mr. Smith obtained legal counsel who contacted Congressman John Barrow, who in turn contacted the VA on May 12, 2014, that Mr. Smith's surgery and other follow-up care was approved on May 13, 2014.  The treatment record reflects that on May 13, 2014, the VA's Acting Chief of Staff, Dr. Shauna S. Kincheloe-Zaren, entered a note in response to Congressman Barrow's letter stating that "[a] new consult [order] was required to evaluate and treat the patient and it was placed on 5/12/201[4]," and that "the appointment [was] scheduled with the ENT on 5/13/2014."  Apparently, this VA doctor knew how to order, or have someone enter an order for, an immediate ENT consult and have it occur the next day.

By the time Mr. Smith's surgery was approved on May 13, 2014,  it had been five months since he saw Dr. Puppala on December 16, 2013, with symptoms and swelling that Dr. Ferris says indicated adult cancer, and four months since the January 14, 2014 CT scans had confirmed the malignant mass in Mr. Smith's throat.  Once the VA's Dr. Kincheloe-Zaren intervened,  Dr. Duke was able to perform the surgery six days later.

On May 19, 2014, Mr. Smith underwent surgery to remove the tumor mass in his neck.  By that time (five months after his December 16 visit) the tumor had grown, and, because it now involved Mr. Smith's carotid artery, Dr. Duke was

15

unable to remove the entire mass through surgery. As a result, Mr. Smith was required to undergo a more intensive chemotherapy and radiation regimen, thereby reducing his chances of survival.

According to Dr. Ferris, Mr. Smith's medical expert, "there is a standard of care for an adult with a mass in the neck," regardless of whether the medical care is within or outside the VA. Dr. Ferris opined that, given the symptoms Mr. Smith presented with during his December VA appointment, a reasonable timeframe from when he "walk[ed] in the door" to "getting on the OR table" would have been a "two-to-three month timeframe." Dr. Ferris added that Mr. Smith's care was "below the standard of [medical] care."

Additionally, Nurse Rose opined, based on her experience as an RN and a VA care manager, her education, and her professional knowledge on the standards of care for nurse care managers, that "Mr. Smith's care was mismanaged from the beginning" and that, "had Mr. Smith's medical condition been properly managed and [his] care coordinated early on and through his illness, his outcome" would have been better.

## G.    Subsequent Developments

On May 29, 2014, Dr. Duke, along with Mr. Smith's oncologists, confirmed a plan of care, which was to begin a few days later on June 3. It was only after Mr. Smith and his counsel held a press conference that the VA finally started his

16

treatments on June 25.  Mr. Smith then underwent chemotherapy and radiation treatments.

By early 2015, Mr. Smith's doctors believed his cancer was in remission, and for the next two and a half years, Dr. Duke continued to see and monitor Mr. Smith.  A routine PET scan in September 2017 revealed a nodule on Mr. Smith's lung, which was the same type of cancer as in his throat.  In May 2018, Mr. Smith had surgery to remove the new tumor and a portion of his left lung.

## IV.  PROCEDURAL HISTORY OF FTCA CLAIM

### A.    Exhaustion of FTCA Claim

Prior to filing this lawsuit, Mr. Smith had to exhaust his FTCA claim through the VA.  Specifically, Mr. Smith filed a "tort claim" under the FTCA, alleging that his "VA healthcare providers negligently failed to timely diagnose and treat [his] tongue cancer."

In a December 2015 letter, the VA's Office of Regional Counsel denied Mr. Smith's claim.  The Regional Counsel's letter stated that the VA had "thoroughly investigated the facts and circumstances surrounding [Mr. Smith's] administrative tort claim" and concluded "there was no negligent or wrongful act on the part of" any VA employee.  The VA, at least at that point, seemingly conceded that medical negligence or malpractice was the proper lens through

which to view Mr. Smith's claims.[5]  That same letter informed Mr. Smith that if he were "dissatisfied," he could "file a request for reconsideration of [his] claim with the VA General Counsel."[6]  Mr. Smith did that.

In a February 2018 letter, the VA's Office of the General Counsel responded that it had reconsidered Mr. Smith's FTCA claim.  The General Counsel "found no evidence of any negligent or wrongful act or omission on the part of a [VA] employee acting within the scope of his or her employment that caused or contributed to any injury to Mr. Smith."  The General Counsel's letter informed Mr. Smith that if he wished to pursue his claim further, he could file suit in a federal court.

## B.    District Court Proceedings

Mr. Smith then filed this suit against the United States ("the government"), pursuant to the FTCA, 28 U.S.C. § 1346(b).  He alleged, inter alia, that "various personnel at the VA[] were negligent in regards to the care and treatment of" his

---

[5]The letter acknowledged that Mr. Smith had framed his grievance as an FTCA negligence claim:

> The Federal Tort Claims Act (FTCA), . . . under which you filed your claim, provides for monetary compensation when a Government employee, acting within the scope of employment, injures another by a negligent or wrongful act or omission.  Medical negligence means there was a breach in the standard of care and that breach proximately caused an injury. The standard of care is the level at which similarly qualified medical professionals, including doctors and nurses, would have managed the care under the same or similar circumstances.

[6]The letter also informed Mr. Smith that, alternatively, he could "file suit directly under the FTCA."

cancer by "[f]ailing to timely act in the face of Smith's concerning symptoms and test results, resulting in inexcusable delay in the diagnosis, at a time when his cancer was treatable and curable," and thereby failed to meet the applicable and appropriate medical standard of care.  Compl. ¶ 38.

The government moved to dismiss Mr. Smith's complaint for lack of subject matter jurisdiction under the VJRA, 38 U.S.C. § 511, which precludes judicial review of VA benefits decisions.  The government acknowledged that Mr. Smith framed his FTCA claim as sounding in medical negligence but argued that his claims actually turned on the fact that his medical care was delayed and thus "he was denied benefits."

The district court agreed and dismissed Mr. Smith's complaint without prejudice.  This appeal followed.

## V.  STANDARD OF REVIEW

We review de novo the dismissal of a complaint for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).  Hall v. U.S. Dep't of Veterans' Affairs, 85 F.3d 532, 533 (11th Cir. 1996); see also McElmurray v. Consol. Gov't of Augusta-Richmond Cnty., 501 F.3d 1244, 1250 (11th Cir. 2007).

19

## VI.  VETERANS' MEDICAL NEGLIGENCE CLAIMS

Before discussing the VJRA, we review how Congress has provided two separate mechanisms by which a veteran may recover for the VA's medical negligence: (1) filing a tort suit for money damages against the United States pursuant to the FTCA; and (2) filing a disability benefits claim with the VA itself.

### A.    The FTCA: Damages Caused by Medical Negligence of VA Personnel

Veterans injured by the negligence of the VA's medical professionals and their supporting personnel can bring suit against the United States in federal district court for medical negligence under the FTCA, 28 U.S.C. § 1346(b)(1).  See United States v. Brown, 348 U.S. 110, 110–13, 75 S. Ct. 141, 142–44 (1954) (concluding that a veteran's lawsuit for medical negligence at a VA hospital, which was authorized by the FTCA, was not barred by the Feres doctrine); McCullough v. United States, 607 F.3d 1355, 1358 (11th Cir. 2010); see also 38 U.S.C. § 515(a)(1) ("[T]he Secretary may settle a claim for money damages against the United States cognizable under section 1346(b) . . . of title 28 . . . .").

The FTCA provides, in relevant part, that district courts "shall have exclusive jurisdiction of civil actions on claims against the United States for money damages . . . for . . . personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government" under certain circumstances.  28 U.S.C. § 1346(b)(1).  Further, as to tort claims related to

20

negligence by VA personnel specifically, § 7316(a)(1) of Title 38 provides that the FTCA will provide the remedy for "damages for personal injury, including death, allegedly arising from malpractice or negligence of a health care employee of the [VA] in furnishing health care treatment," a remedy that is "exclusive of any other civil action or proceeding by reason of the same subject matter." 38 U.S.C. § 7316(a)(1) (emphasis added). Section 7316(a)(2) goes on to define "health care employee" to mean a "physician, dentist, podiatrist, chiropractor, optometrist, nurse, physician assistant, expanded-function dental auxiliary, pharmacist, or paramedical (such as medical and dental technicians, nursing assistants, and therapists), or other supporting personnel." Id. § 7316(a)(2). The standards of care that govern medical professionals (which are set forth in the tort law of each state) are incorporated into the FTCA. See Anestis, 749 F.3d at 527.

Before filing an FTCA lawsuit, an individual must "have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing." 28 U.S.C. § 2675(a); see also 28 C.F.R. § 14.9. This is what Mr. Smith did. He filed what the VA referred to as an "Administrative Tort Claim" in order to exhaust his FTCA claim. And after his claim was denied, the VA's General Counsel wrote him that if he wished to pursue his claim further, he should file suit "in Federal district court within six months"

21

and "should name the United States as the defendant." This is what Mr. Smith also timely did.

**B.    Section 1151(a): Disability Benefits Resulting from Medical Negligence**

Separate from seeking money damages for negligence under the FTCA, there is another, independent track for recovery that veterans can pursue simultaneously. A veteran may also seek "[b]enefits" under 38 U.S.C. § 1151(a) for disability or death resulting from negligence on the part of VA medical professionals or occurring in a VA facility. 38 U.S.C. § 1151(a)(1). Section 1151(a)(1) provides, in relevant part, that "[c]ompensation" will be awarded for disability or death "if the disability or death was not the result of the veteran's willful misconduct" and

> **(1)**   the disability or death was caused by hospital care, medical or surgical treatment, or examination furnished the veteran . . . and the proximate cause of the disability or death was—
>
> **(A)**   carelessness, negligence, lack of proper skill, error in judgment, or similar instance of fault on the part of the Department in furnishing the hospital care, medical or surgical treatment, or examination . . . .

38 U.S.C. § 1151(a)(1); see also Viegas v. Shinseki, 705 F.3d 1374, 1378 (Fed. Cir. 2013). Any disability or death benefits received pursuant to § 1151(a) must be offset against any money damages a veteran might receive via an FTCA tort suit. 38 U.S.C. § 1151(b). We now turn to the VJRA.

22

## VII.  THE VJRA

### A.    History Before 38 U.S.C. § 511(a)

Initially, the limitation on judicial review of VA benefits decisions was located in former 38 U.S.C. § 211(a).  Section 211(a) precluded judicial review of the VA Administrator's decisions under "any law administered by the [VA] providing benefits for veterans," as follows:

> [T]he decisions of the Administrator on any question of law or fact under any law administered by the Veterans' Administration providing benefits for veterans and their dependents or survivors shall be final and conclusive and no other official or any court of the United States shall have power or jurisdiction to review any such decision by an action in the nature of mandamus or otherwise.

See 38 U.S.C. § 211(a) (1982) (emphasis added).

Then, in 1988, the Supreme Court in Traynor v. Turnage held that a district court properly exercised jurisdiction over two veterans' suits challenging the VA's decision that they were ineligible for out-of-time educational-assistance benefits under the GI Bill.  485 U.S. 535, 538–39, 108 S. Ct. 1372, 1376–77 (1988).  The GI Bill allowed veterans to obtain an extension of the 10-year eligibility period for educational assistance "if they were prevented from using their benefits earlier by 'a physical or mental disability which was not the result of [their] own willful misconduct.'"  Id. at 538, 108 S. Ct. at 1376 (quoting former 38 U.S.C. § 1661 (alteration in original)).  The VA denied the veterans educational benefits,

23

determining their alcoholism disability was the result of their own willful misconduct.  Id.

Filing suit in federal court, the veterans claimed, inter alia, that the VA's educational-benefits denial violated § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, which bars discrimination against handicapped individuals solely because of their handicap.  Id. at 537, 539.  In Traynor, the Supreme Court held that § 211(a) did not preclude judicial review of the VA's educational-benefits decision.  The Supreme Court reasoned that, while the veterans' entitlement to educational benefits under the GI Bill was a question of law or fact "under any law administered by the [VA]," the case also "involve[d] the issue whether the law sought to be administered is valid in light of a subsequent statute whose enforcement is not the exclusive domain of the Veterans' Administration"— namely, the Rehabilitation Act.  Id. at 543–45, 108 S. Ct. at 1379–80.

**B.    Text of § 511(a)**

In response to Traynor and other decisions by lower courts, Congress amended § 211 via the VJRA, and the relevant provision was later relocated to § 511(a).  See Veterans' Judicial Review Act, Pub. L. No. 100-687, § 101, 102 Stat. 4105, 4105 (1988); Dep't of Veterans Affairs Codification Act, Pub. L. No. 102-83, § 2, 105 Stat. 378, 388–89 (1991).  The limitation on judicial review of benefits decisions, located in § 511(a), now reads:

> The Secretary shall decide all questions of law and fact <u>necessary to a decision</u> by the Secretary <u>under a law that affects the provision of benefits</u> by the Secretary to veterans or the dependents or survivors of veterans. . . . [T]he decision of the Secretary as to any such question shall be final and conclusive and may not be reviewed by any other official or by any court, whether by an action in the nature of mandamus or otherwise.

38 U.S.C. § 511(a) (emphasis added).[7]  Section 511(a) does two things.  First, "once the Secretary has been asked to make a decision in a particular case" (e.g., whether a veteran is eligible for or entitled to benefits), it "imposes a duty on the Secretary to decide all questions of fact and law <u>necessary to a decision</u> in that case."  See <u>Hanlin v. United States</u>, 214 F.3d 1319, 1321 (Fed. Cir. 2000) (emphasis added).  Second, it precludes judicial review of those decisions.

The House Report on the VJRA gave examples of "questions of law and fact" that might be "necessary to a decision by the Secretary" in a benefits case apart from the substantive benefits decision itself.  The Report explained that where a veteran alleges, for example, "that a statute is unconstitutional, that VA procedure deprives him or her of due process of law, or that a VA regulation is inconsistent with a later-enacted statute," the Secretary "must take a position with respect to such a contention if it is necessary to a decision in a case."  H.R. Rep.

---

[7]A VA regulation defines a "benefit" to include "any payment, service, commodity, function, or status, entitlement to which is determined under laws administered by the Department of Veterans Affairs pertaining to veterans and their dependents and survivors."  38 C.F.R. § 20.3(e).

25

No. 100-963, at 27 (1988), reprinted in 1988 U.S.C.C.A.N. 5782, 5809.  By

including "necessary to a decision," § 511(a) requires the Secretary not only to

make a substantive benefits determination, but also to decide all questions of law

or fact that bear on that benefits determination.  In turn, the Secretary's decision on

such "necessary" questions is not subject to outside judicial review.  Instead, a

veteran's only avenue for review of those questions is the VA's administrative

appeals process.[8]

Next, we review how our Court and other circuits have interpreted § 511(a).

---

[8]Under this process, a veteran may appeal a decision of the Secretary to the Board of Veterans' Appeals (the "Board"), whose ruling becomes the final decision of the Secretary.  38 U.S.C. § 7104(a).  Decisions of the Board may then be reviewed exclusively by the U.S. Court of Appeals for Veterans Claims, an Article I court established by the VJRA.  Id. §§ 7251, 7252(a), 7266(a).  Decisions of the Court of Appeals for Veterans Claims are in turn appealable only to the U.S. Court of Appeals for the Federal Circuit, and only as to certain legal issues relied upon by the Article I court.  Id. § 7292(a), (c).  The Federal Circuit's judgment is subject to certiorari review by the Supreme Court.  Id. § 7292(c).

This appeal process is kicked off when the Secretary, "on a timely basis, provide[s] to the claimant (and to the claimant's representative) notice" of a decision "under section 511 . . . affecting the provision of benefits to a claimant."  Id. § 5104(a).  Such notice "shall include an explanation of the procedure for obtaining review of the decision."  Id.  A veteran initiates an appeal of the Secretary's decision by timely filing a "Notice of Disagreement" with the Board "on any issue or issues for which the VA provided notice of a decision under 38 U.S.C. § 5104." 38 C.F.R. § 20.4(a)(1).

A comprehensive review of the history of the VJRA and the administrative appeals process it created can be found in the Ninth Circuit's thorough en banc opinion in Veterans for Common Sense v. Shinseki, 678 F.3d 1013, 1020–23 (9th Cir. 2012) (en banc).

## VIII.  ELEVENTH CIRCUIT PRECEDENT

### A.    One Published Precedent

Our Court has analyzed § 511(a)'s limitation on judicial review of benefits decisions in only one published opinion, Hall v. United States Department of Veterans' Affairs, 85 F.3d 532 (11th Cir. 1996).

That case involved plaintiff William Hall, who was a recipient of veterans' disability benefits and a Florida state prisoner. Hall, 85 F.3d at 532. The VA reduced his disability compensation pursuant to a regulation requiring that compensation be diminished during periods of incarceration for felony convictions in excess of 60 days. Id. at 532–33. The VA also sought the return of around $15,000 due to overpayments to Hall during his incarceration. Id. at 533. Hall's lawsuit claimed that the regulation reducing benefits during incarceration was unconstitutional and requested payment of his full disability benefits. Id.

This Court affirmed the dismissal of Hall's lawsuit for lack of subject matter jurisdiction. Id. at 533, 535. We stated that, "under the statutory scheme" established by the VJRA, "a veterans' entitlement to benefits" can be reviewed only by appeal "to the Board [of Veterans Appeals], then to the Court of Veterans Appeals, the Federal Circuit Court of Appeals, and the Supreme Court." Id. at 534 (emphasis added). Because the constitutionality of the regulation at issue was a question of law "necessary to a decision by the Secretary under a law affecting

27

veterans' benefits," the district court lacked jurisdiction to decide that question. Id. at 535.

Hall's lawsuit did not challenge any medical care received through the VA. Although he claimed that the reduction in his disability benefits "constituted a tort in violation of numerous provisions of the constitution," he alleged no medical negligence by any VA professionals. Id. at 533. Rather, Hall alleged a quintessential benefits claim: he was entitled to the full amount of his disability benefits notwithstanding his incarceration. See id. at 532–33.

Further, because the VA had reduced Hall's benefits in an adverse benefits decision, Hall could appeal that benefits decision though the VA's administrative appeals process. Id. at 534–35. Hall presents a clear example of a case over which a federal court lacks jurisdiction under the VJRA: a challenge to the constitutionality of a statute providing for the provision of benefits. See H.R. rep. No. 100-963, at 27. Unlike here, there was no medical negligence claim in Hall.

**B.    Unpublished Decisions**

In two appeals in the same case, this Court later considered a pro se veteran's FTCA lawsuit involving an MRI. See Milbauer v. United States, 587 F. App'x 587, 588 (11th Cir. 2014) (Milbauer I); Milbauer v. United States, 636 F. App'x 556, 557 (11th Cir. 2016) (Milbauer II). The VA staff recommended an MRI. But due to his claustrophobia, Milbauer wanted an "open" MRI, which

28

required that the MRI be performed at a non-VA facility.  Milbauer I, 587

F. App'x at 588.  Milbauer's complaint "alleged he was entitled to have an open

MRI performed at a non-VA facility at the VA's expense, and he described the

numerous problems he had faced in attempting to obtain authorization for the

outside MRI."  Id. (emphasis added).  He further alleged that the VA staff should

have authorized alternative imaging studies to assess his injury.  Id. at 589.

In the first appeal, this Court concluded that "[t]he district judge could not

adjudicate Milbauer's [MRI] claim 'without determining first whether [Milbauer]

was entitled to a certain level of benefits,' namely, whether he was entitled to an

outside MRI, paid for by the VA."  Id. at 591–92 (emphasis added) (quoting

Thomas v. Principi, 394 F.3d 970, 974 (D.C. Cir. 2005)).  While this Court

acknowledged that the VA had not actually denied the request for an MRI

altogether, it observed in dicta that "there is no meaningful legal difference

between a delay of benefits [for approval of the outside MRI] and an outright

denial of benefits for purposes of the VJRA."  Id. (quoting Mehrkens v. Blank, 556

F.3d 865, 870 (8th Cir. 2009)) (quotation marks omitted).  Specifically, the delay

between when the VA medical staff recommended the procedure and when

Milbauer "finally obtained . . . authorization and received an open MRI at a non-

VA facility" was ten months.  Id. at 588.  Milbauer alleged that the medical staff

had deviated from the appropriate standards of medical care by failing "to have the

29

appropriate paperwork prepared <u>to authorize the outside MRI</u> for a period of ten months." <u>Id.</u> at 589 (emphasis added) (quotation marks omitted).

As for Milbauer's alternative-diagnostic-procedures claim, our Court similarly concluded, in the second appeal, that Milbauer had fundamentally contended that "the VA was obligated to provide him with a particular benefit—an alternative imaging procedure to diagnose his shoulder injury—and failure of the VA to provide that benefit caused a delay in his diagnosis." <u>Milbauer II</u>, 636 F. App'x at 561.

Beyond the non-binding nature of these decisions,[9] we note two points. First, the <u>Milbauer</u> case is materially different. This Court said: "Milbauer's grievance was with the VA's benefits procedure [for approving outside imaging], not the medical treatment he received." <u>Milbauer I</u>, 587 F. App'x at 589. In contrast, in Mr. Smith's case, the VA approved and never disputed his eligibility for and entitlement to the benefits, both inside and outside the VA. Rather, Mr. Smith alleges that the VA's medical personnel negligently performed the medical care that was approved and committed medical negligence.

Second, we recognize that the government cites our dicta in <u>Milbauer I</u> that "there is no meaningful legal difference between a <u>delay</u> in benefits and an outright

---

[9]Unpublished opinions are non-precedential. <u>See</u> Bonilla v. Baker Concrete Const., Inc., 487 F.3d 1340, 1345 n.7 (11th Cir. 2007) ("Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants.").

denial of benefits." See Gov't Br. at 9.  But as shown above, the delay in benefits in Milbauer I was getting an outside MRI approved—not a delay in conducting that MRI after it was authorized and approved.  See Milbauer I, 587 F. App'x at 588.  Our Court actually took that statement from an Eighth Circuit case, Mehrkens v. Blank, involving an adverse denial of benefits that provides context for this statement.

Specifically, in Mehrkens, a Vietnam War veteran brought a Bivens[10] action against doctors and employees of the VA.  Mehrkens, 556 F.3d at 866.  He claimed that "VA officials violated his due-process rights by withholding information from him about his diagnosis of PTSD and preventing him from obtaining proper treatment for that condition."  Id. at 867

Mehrkens alleged that VA officials "lie[d]to him and others about his Post-Traumatic Stress Disorder (PTSD)" and "withheld treatment from him."  Id. at 866.  Mehrkens filed a benefits claim for military service–connected PTSD, which the VA denied.  Id. at 867.  The VA determined that "the diagnosis of PTSD was not supported by the details of any service-connected stressor" and that the medical evidence did not show symptoms of PTSD.  Id. (quotation marks omitted).  After multiple failed attempts to reopen his case, Mehrkens filed a Notice of

---

[10]Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 91 S. Ct. 1999 (1971).

31

Disagreement, and the VA reversed its prior decisions, granting him "benefits" for PTSD, retroactive to 1992.  Id.

In rejecting Mehrkens's Bivens claim, the Eighth Circuit noted that "[i]n this case" there was no meaningful difference between a delay and a denial of benefits. Id. at 870.  But that was because "[i]n [that] case," the delay in Mehrkens's PTSD benefits was the result of an adverse decision by the VA.  The delay was between the initial adverse benefits decision in 1992 and the later approval of PTSD benefits in 2004.  See Mehrkens, 556 F.3d at 870 (noting that, had Mehrkens "been granted benefits in 1992 instead of 2004, he would not have brought the current action").  As a result, any court tasked with adjudicating whether the VA personnel violated Mehrkens's rights would necessarily have to address whether the VA acted properly in denying his PTSD benefits claim in the first instance.  In contrast, in Mr. Smith's case, the VA approved and authorized his benefits, and there was never an adverse benefits decision for a federal court to reexamine.

Because no authority from our Court resolves the issues before us, we further review our sister circuits' decisions cited by the parties.

## IX.  OTHER CIRCUITS' DECISIONS

### A.    D.C. Circuit

In three cases, the D.C. Circuit has interpreted what constitutes a decision by the Secretary on "questions of law and fact necessary to a decision . . . under a law

32

that affects the provision of benefits to veterans." 38 U.S.C. § 511(a). See Broudy v. Mather, 460 F.3d 106 (D.C. Cir. 2006); Thomas v. Principi, 394 F.3d 970 (D.C. Cir. 2005); Price v. United States, 228 F.3d 420 (D.C. Cir. 2000).

In Price, the plaintiff's pro se complaint alleged the VA had "wrongfully failed to reimburse him for certain medical expenses he incurred in October 1994 while hospitalized for an emergency colon cancer operation at a non-VA medical facility."[11] 228 F.3d at 421 (emphasis added). Price sought $5 million in damages for his medical expenses and emotional distress. Id. The VA determined that Price had failed to satisfy the "eligibility criteria" for reimbursement. Id. Price alleged that "the VA's failure to pay his medical bills was wrongful because the agency was under a legal obligation to make payment on account of Price's veteran status." Id. The D.C. Circuit concluded that the district court lacked jurisdiction because "underlying the claim is an allegation that the VA unjustifiably denied him a veteran's benefit." Id.

The D.C. Circuit also noted that, assuming Price's tort claim under the FTCA for "negligent failure to pay medical bills" was even cognizable under Florida law, "a necessary predicate of such a claim is a determination that the insurer [the VA for veteran Price] acted in bad faith," which would have required

---

[11]Price also sued the Northeast Florida Credit Bureau, alleging it caused him harm when it persistently sought to collect on Price's unpaid medical bills. Price, 228 F.3d at 421.

33

that the district court "determine first whether the VA acted properly in handling Price's request for reimbursement." Id. at 422.  That determination would require the district court to rule first on whether the VA had applied its own "eligibility criteria" correctly, and judicial review was therefore "foreclosed by 38 U.S.C. § 511(a)." Id. at 421–22.  To summarize, the Price case involved a classic veteran's benefits claim about eligibility for reimbursement of expenses incurred at a non-VA facility, a dispute over which the district court clearly lacked subject matter jurisdiction under the VJRA.

Five years later, the D.C. Circuit interpreted the VJRA again, this time in a veteran's lawsuit to collect "mental and physical disability benefits." Thomas, 394 F.3d at 972.  The VA had denied Thomas disability benefits on the ground that no final diagnosis that would entitle him to benefits had been made. Id.  After years of Thomas's appeals and benefits claims, the VA in 1999 revealed that a VA doctor in 1991 had diagnosed Thomas as having symptoms consistent with schizophrenia. Id.  Thomas filed a lawsuit, which the district court dismissed for lack of jurisdiction. Id. at 972–73.

Reversing in part, the D.C. Circuit concluded that Thomas alleged at least some VA actions in Counts III, V, and X that the district court could adjudicate. Id. at 974, 976.  Count III alleged intentional infliction of emotional distress caused by the intentional coverup of the schizophrenia diagnosis. Id.  Count V alleged

34

gross negligence and medical negligence in failing to inform Thomas about his schizophrenia diagnosis.  Id.  Count X alleged medical malpractice by not ensuring Thomas knew, and taking time to communicate, that he had been diagnosed with schizophrenia and had choices of whether to receive medical treatment.  Id.  The D.C. Circuit reasoned that any "questions of law and fact" raised by the claims "relate to whether the alleged withholding of the diagnosis states a tort claim, and resolution of those questions is not 'necessary' to the benefits determination."  Id. (quoting 38 U.S.C. § 511).  And "no denial of benefits underl[ies] Thomas's failure-to-inform allegations."  Id. at 974–75 (alteration in original) (quotation marks omitted).

The D.C. Circuit, however, concluded that other aspects of Thomas's claims—based on the VA's "continuous and persistent" failure to render needed medical care—would require the district court to first determine whether the VA acted properly in denying Thomas benefits.  Id. at 975.  Indeed, the VA had not disclosed the schizophrenia, had provided no medical treatment, and had denied Thomas all disability benefits.  See id. at 972.  Thus, the Secretary's denial of all benefits did underlie those claims.

A year later in Broudy v. Mather, the D.C. Circuit again rejected a district court's decision that it lacked jurisdiction over the plaintiff veterans' lawsuit under the VJRA.  460 F.3d at 108.  The veterans were exposed to atomic radiation but

35

were denied disability benefits because they had not shown their illnesses resulted from radiation exposure during their military service.  Id. at 108, 110.  In a putative class action, the veterans filed constitutional Bivens claims against VA officials and others for withholding radiation test results that revealed their exposure to dangerous levels of atomic radiation.  Id. at 109–10.  Seeking money damages, the veterans alleged that the withholding of the test results had prevented them from successfully pursuing claims for disability benefits.  Id. at 110.

In Broudy, the D.C. Circuit concluded that the district court had jurisdiction over the veterans' Bivens suit.  Id. at 115.  After reviewing Price and Thomas, the D.C. Circuit reasoned that, "while the Secretary is the sole arbiter of benefits claims and issues of law and fact that arise during his disposition of those claims," district courts maintain jurisdiction to consider questions arising under laws that affect the provision of benefits "as long as the Secretary has not actually decided them in the course of a benefits proceeding."  Id. at 114 (emphasis added).  The D.C. Circuit then analyzed "whether the Secretary had made an 'actual decision' on any issues that the parties [were] asking the District Court to decide here."  Id.

The government pointed to two such issues: (1) whether the withheld test results impaired or foreclosed the veterans' benefits claims; and (2) whether the radiation exposure amount relied upon by the VA, in denying the veterans' claims, failed to consider relevant information in the government's possession that the VA

36

Secretary did not have.  Id.  The D.C. Circuit concluded the Secretary had not decided those questions, nor were the resolution of those questions necessary to the Secretary's actual decision to deny the veterans disability benefits.  Id.  Therefore, there was no jurisdictional bar in the VJRA to the district court's consideration of those issues.  Id. at 114–15.  In responding to the government's attempt to "claim the benefit" of Price and Thomas, the D.C. Circuit observed:

> In Price and Thomas, if the District Court had exercised jurisdiction, it would have needed to 'review' the Secretary's 'actual decisions' that veterans were not entitled to the benefits they sought.  Here, by contrast, no such 'review' is required.  Unlike the plaintiffs in Price and Thomas, the plaintiffs in this case are not asking the District Court to decide whether any of the veterans whose claims the Secretary rejected are entitled to benefits.  Nor are they asking the District Court to revisit any decision made by the Secretary in the course of making benefits determinations.

Id. at 115 (emphasis added).

At bottom, the D.C. cases differentiated between: (1) decisions by the VA denying entitlement to disability benefits (Thomas) or medical-expense reimbursement benefits (Price), which would require the district court to revisit a benefits decision; (2) claims of medical negligence or malpractice (Thomas), which are not decided in the course of benefits determinations; and (3) claims challenging other VA conduct, which asked a court to decide questions that the Secretary had not decided and were not necessary to a specific adverse benefits decision (Broudy).

37

**B.    Ninth Circuit**

In two more recent cases, the Ninth Circuit interpreted the VJRA's § 511(a). See Tunac v. United States, 897 F.3d 1197 (9th Cir. 2018); Veterans for Common Sense v. Shinseki, 678 F.3d 1013 (9th Cir. 2012) (en banc).  In both, the Ninth Circuit more clearly distinguished claims for medical negligence against the VA's medical professionals who provide the health care (medical diagnosis and treatment) from claims of negligence by the VA's administrative employees who process benefits claims and schedule appointments.

In Shinseki, two non-profit organizations, on behalf of themselves, their members, and a veteran class with PTSD, filed suit to challenge the VA's internal administrative procedures.  678 F.3d at 1017.  They claimed the VA's procedures caused systemic delays in the processing of mental health care from the VHA and the adjudication of claims for disability compensation benefits by the Veterans Benefits Administration ("VBA").  Id. at 1016–17.

The plaintiffs alleged that the VA's handling of mental health care and disability claims deprived them of property (benefits) in violation of the Constitution's Due Process Clause and the VA's statutory duty to provide timely medical care and disability benefits.  Id. at 1017.  Specifically, the plaintiffs challenged: (1) the lack of any VHA procedures to expedite the processing of PTSD claims and, in turn, to expedite access to mental health care, including the

lack of any procedures by which veterans might appeal the VA's administrative scheduling decisions; (2) the VBA's delays in adjudication and resolution of disability-compensation claims, which adjudication begins at one of the VA's 57 regional offices and proceeds through the administrative appeals process established by the VJRA; and (3) the constitutionality of various other VBA practices and procedures, including the absence of trial-like adversarial procedures. Id. at 1017–18, 1028.

As injunctive relief, the plaintiffs sought the implementation of new procedures for handling mental health care requests, the creation of an accelerated appeals process for such claims, and a conversion of the claims-adjudication process into an adversarial proceeding. Id. at 1016, 1017.

After surveying and synthesizing other Circuits' decisions, the Ninth Circuit en banc announced this broad rule: "§ 511 precludes jurisdiction over a claim if it requires the district court to review VA decisions that relate to benefits decisions, including any decision made by the Secretary in the course of making benefits determinations." Id. at 1025 (quotation marks and citations omitted).

The Ninth Circuit then concluded that it lacked jurisdiction over the plaintiffs' systemic challenges to the VA's internal procedures for processing claims and scheduling treatments. Id. at 1026–29. Yet it also acknowledged that, notwithstanding the VJRA, the FTCA "specifically confers jurisdiction on federal

district courts to hear . . . claims" that "alleg[e] negligence against VA doctors,"
and that the VA even has "separate procedures for dealing with FTCA claims."  Id.
at 1023 & n.13.  Thus, the Ninth Circuit "could consider a veteran's [FTCA] claim
alleging negligence against VA doctors because doing so would not 'possibly have
any effect on the benefits he has already been awarded.'"  Id. at 1023 (quoting
Littlejohn v. United States, 321 F.3d 915, 921 (9th Cir. 2003)).

Subsequently, in Tunac v. United States, the Ninth Circuit further explained
the difference between claims of medical negligence against "healthcare
employees," defined as "medical professionals and related support staff," and
claims of negligence "in the VA's operations," such as negligence in scheduling
appointments and treatments.  897 F.3d at 1200.  Veteran Tunac was diagnosed
with kidney inflammation during his Navy deployment.  Id.  After military
retirement, Tunac received treatment through the VA, but also saw a private
physician for other issues.  Id.  In 2009, Tunac's blood tests showed signs of
kidney failure, and his private physician ordered he immediately make an
appointment with the VA.  Id.  Tunac was not seen at the VA until December 2,
2009, when a biopsy confirmed end-stage kidney disease, necessitating dialysis.
Id.  The VA, however, could not schedule dialysis immediately and not until
December 30, 2009.  Id.  Tunac died on December 27, 2009.  Id.

40

Veteran Tunac's widow brought an FTCA suit for wrongful death (Count I) and negligent/medical malpractice (Count II).  Id.  Count I alleged that the VA and its employees caused Tunac's death by failing to provide him with "adequate follow-up care and treatment to monitor [his] condition and identify any potential relapses or adverse changes to his health"; "[f]ailing to schedule [Tunac] for immediate (or even timely) treatment after the deterioration of his condition, as evidenced by his blood work in 2009"; and "[f]ailing to schedule [Tunac] for immediate dialysis after the results of his kidney biopsy in December 2009."  Id. at 1200–01 (second and third alterations in original) (quotation marks omitted).  Count II alleged that the employees and the VA breached their duty to Tunac "to provide him with timely, quality healthcare."  Id. at 1201 (quotation marks omitted).

The "question" before the Ninth Circuit was whether it had "jurisdiction over a claim alleging that a medical center operated by the [VA] caused . . . Tunac's death by delaying urgently needed medical treatment."  Id. at 1200.  The Ninth Circuit concluded that (1) it lacked jurisdiction over "[t]he complaint's claims regarding negligence in VA operations," but (2) it retained jurisdiction under the FTCA "to the extent the complaint alleges negligence by VA healthcare employees (defined as medical professionals and related support staff listed in 38 U.S.C. § 7316(a)(2))."  Id. (emphasis added).

41

After reviewing Shinseki, the Ninth Circuit noted that, "[n]otwithstanding the expansive scope of § 511's preclusion of judicial review, [Shinseki] acknowledged that we continue to have jurisdiction to hear some claims brought by individual veterans under the FTCA." Id. at 1203. Relying on Shinseki, the Ninth Circuit announced a standard for discerning whether a claim is one for medical negligence under the FTCA, instead of a claim that the VA acted improperly in handling a veteran's request for benefits: "[W]hen a plaintiff brings an action against a VA health care employee (meaning the professionals and related support staff listed in 38 U.S.C. § 7316(a)(2)) alleging injury from a negligent medical decision, the action may proceed under the FTCA and is not barred by the VJRA." Id. at 1204–05.

Applying that standard, the Ninth Circuit concluded it had jurisdiction over "certain claims that give rise to a 'reasonable inference' that VA medical professionals breached their duty of care." Id. at 1205. It then listed these allegations in the complaint: (1) "[t]he VA failed to properly order tests and/or evaluate [Tunac's] recurring lupus condition"; and (2) "the VA and its employees caused [Tunac's] death through their wrongful acts and neglect" by "[f]ailing to provide [Tunac] with adequate follow-up care and treatment to monitor [his] condition and identify any potential relapses or adverse changes to his health." Id. (first and fourth alterations in original) (quotation marks omitted). The Ninth

42

Circuit determined that, "[t]o the extent these allegations relate to claims of medical negligence on the part of medical professionals, they do not relate to benefits decisions." Id. (emphasis added).

On the other hand, the Ninth Circuit also held that it lacked jurisdiction to consider Mrs. Tunac's claims that her husband's "death was caused by the VA's failure 'to schedule [Tunac] for immediate (or even timely) treatment after the deterioration of his condition,'" the VA's "failure 'to schedule [Tunac] for immediate dialysis after the results of his kidney biopsy in December 2009,'" or "similar allegations relating to the negligence in scheduling appointments and treatment." Id. (emphasis added). These claims, the Ninth Circuit reasoned, sought "relief for the type of administrative negligence in scheduling appointments that must be channeled through the VJRA."[12] Id. at 1205–06. The Ninth Circuit explained that these allegations were better understood as complaints about "whether the VA handled [Tunac's] requests properly." Id. at 1203 (quoting Shinseki, 678 F.3d at 1028).

---

[12]Although the Ninth Circuit concluded it retained jurisdiction over certain of Mrs. Tunac's claims, it nonetheless affirmed the district court's dismissal of her complaint, as it determined that her claims related to medical negligence were untimely. Tunac, 897 F.3d at 1206–07.

43

## C.    Sixth Circuit

The Sixth Circuit has also emphasized that the VA's medical team and clinics have a legal duty to abide by ordinary standards of medical care, irrespective of a veteran's status.  See Anestis v. United States, 749 F.3d 520, 526 (6th Cir. 2014).  In Anestis, the Sixth Circuit reversed the district court's dismissal for lack of jurisdiction of an FTCA suit brought by a veteran's widow.  Id. at 522, 524.

Veteran Anestis committed suicide after he was turned away from two VA clinics.  Id. at 522.  At the first VA clinic, the intake clerk recognized that Anestis was in urgent need of treatment, but no mental health professional was available that day.  Id. at 523.  So she sent him to another clinic.  Id.  That second VA clinic turned Anestis away because: (1) he did not have his DD-214 (a document reflecting a veteran's deployment dates and other information) showing his eligibility; and (2) his enrollment status in the VA's electronic record was "Rejected: Below Enrollment Group Threshold."  Id. at 521–23.  Both parties agreed Anestis was ineligible for VA benefits that day.  Id. at 527.

In her FTCA lawsuit, Anestis's widow alleged claims of medical malpractice for failure to provide mental health treatment when her husband needed emergency care.  Id.  at 524.  The district court dismissed her claims, concluding they necessarily challenged a VA benefits determination.  Id.

44

The Sixth Circuit acknowledged that the VJRA creates "a broad preclusion of judicial review" of the Secretary's decisions "regarding benefits." Id. at 525 (quotation marks omitted).  But the court rejected the government's argument that the VA clinics' decisions not to provide Anestis medical care were benefits determinations under the VJRA.  Id.  The Sixth Circuit focused particularly on the fact that the plaintiff widow was "not challenging the VA's decisions and actions regarding [Anestis's] application for benefits or his eligibility or enrollment status."  Id. at 526.  The plaintiff did not argue that Anestis "should have been eligible for benefits."  Id. at 527.  Instead, the widow argued that "the VA violated standards of medical care and its own policies by refusing treatment when [Anestis] presented himself at two VA facilities in a state of emergency."  Id.  In this way, "the VA violated its duty as a hospital, irrespective of [Anestis's] status as a veteran."  Id. at 526.  Thus, the plaintiff's claim "exist[ed] wholly independently of a need for any benefits determination."  Id. at 527.

The Sixth Circuit hastened to add, however, that "simply characterizing a claim as a 'failure to treat' claim does not preclude a benefits determination from also being at issue."  Id. at 527.  The "distinction," the Sixth Circuit explained, "lies in whether the failure or denial of treatment resulted from a decision by the VA or was the result of the VA's negligence in failing to abide by a legal duty."

45

Id.  The plaintiff's claim involved the latter, and the district court thus maintained jurisdiction to adjudicate the FTCA claim.  Id. at 528.

Importantly, too, the Sixth Circuit rejected the government's argument that the plaintiff's claim necessarily involved a benefits determination because her claim challenged "numerous aspects of VA medical-benefits decision-making," since she claimed the VA "failed to adhere to their internal policies when [Anestis] sought treatment."  Id. at 527–28 (quotation marks omitted).  The Sixth Circuit reasoned that the government's interpretation of "benefits determination" was so broad as to effectively bar suit against the VA "under any circumstances for failure to provide medical treatment," which would have been at odds with the VJRA, which, after all, "only specifies that the Secretary must decide all questions affecting 'provision[] of benefits.'"  Id. at 528 (quoting 38 U.S.C. § 511).[13]

With the distinctions drawn in these circuit decisions in mind, we now apply the VJRA to Mr. Smith's case.

---

[13]The Sixth Circuit also addressed how the case before it fit into the then-extant precedent from the D.C. and Ninth Circuits.  Anestis, 749 F.3d at 525–27.  The Sixth Circuit favorably compared the claims before it to the claims that the D.C. Circuit allowed to go ahead in Thomas, noting that, "[l]ike the claims in Thomas, [the plaintiff's] claim is based on standards of care that govern medical professionals."  Id. at 527.

As for the Ninth Circuit's precedent, the Sixth Circuit acknowledged Shinseki, but noted that the Ninth Circuit's holding in that case was that the veterans' claim—challenging delays in the VA's adjudication of veterans' mental health care—"clearly" would have required the district court "to review [a] benefits determination in order to reach a decision."  Id. at 526–27.  No such review was needed in Anestis.  Id. at 527.

## X.  DISCUSSION

### A.    Issue on Appeal

On appeal, Mr. Smith argues that the district court erred in dismissing his case because: (1) his complaint adequately stated claims of medical negligence or malpractice by VA personnel, properly brought under the FTCA; (2) his claims raise questions of law and fact relating to breach of the legal duty to exercise the medical standard of care applicable to all doctors, nurses, and health care employees, irrespective of his veteran status; (3) no denial of benefits or any adverse benefits decision underlies his medical negligence or malpractice claims; and (4) therefore, § 511(a) does not apply and the district court had jurisdiction to adjudicate his claims under the FTCA.

The government responds that Mr. Smith's claims concern only "delays in the approval and provision of veterans' benefits," and, therefore, the district court lacked jurisdiction over them.  The government acknowledges that certain aspects of his claims may sound like medical malpractice but contends his allegations still relate to the VA's delay "in approving and scheduling him for medical care."  The government also argues that even a complete failure to treat, or an inordinate delay

in treatment, by the VA would not form the basis of an FTCA negligence claim over which a federal court might exercise jurisdiction.[14]

The sole issue on appeal is a jurisdictional question: Whether Mr. Smith's claims present, and require a federal court to review, "questions of law and fact necessary to a decision by the Secretary under a law that affects the provision of benefits"? See 38 U.S.C. § 511(a). If they do, the court lacks jurisdiction. If they do not, the court has jurisdiction. We start with the text of § 511(a).

## B.    Text of § 511(a)

Section 511(a)'s limitation on judicial review includes two key phrases. The first key phrase is "a decision by the Secretary under a law that affects the provision of benefits . . . to veterans." Id. Numerous federal statutes and hundreds of federal regulations govern a veteran's eligibility for benefits, entitlement to benefits, and the scope of those benefits, and thereby "affect[] the provision of benefits . . . to veterans." Therefore, any and all determinations by the Secretary as to eligibility, entitlement, or the scope of benefits (including health care benefits) is "a decision by the Secretary under a law that affects the provision of benefits."

---

[14]At oral argument, the government's counsel was asked whether she agreed that "at some point, if the VA, which has sole responsibility for scheduling . . . appointments," takes an inordinate amount of time—say five years—to get a veteran needed treatment, the VA "commits malpractice." In response, the government's counsel conceded that such a delay could constitute malpractice, but insisted it was "still malpractice that must be channeled through the VJRA." Under this view, any issue a veteran had in not receiving necessary medical care could be addressed only through the administrative appeals process established by the VJRA—a process designed to address a veteran's entitlement to benefits, not tort claims.

The second key phrase is "questions of law and fact" by the Secretary "necessary to" that benefits decision. 38 U.S.C. § 511(a). It is obvious that any type of substantive benefits decision itself is unquestionably shielded from judicial review by § 511(a). But in addition to precluding judicial review of any substantive benefits determination by the Secretary, the VJRA also precludes judicial review of "any decision made by the Secretary in the course of making [a] benefits determination[]." See Tunac, 897 F.3d at 1202; see also Broudy, 460 F.3d at 115 (identifying the relevant inquiry under the VJRA as whether the plaintiffs were asking the district court either "to decide whether any of the veterans whose claims the Secretary rejected are entitled to benefits" or "to revisit any decision made by the Secretary in the course of making benefits determinations"). The VJRA thus serves to prevent judicial second-guessing of decisions made by the Secretary in the course of making a benefits determination.

While the text is plain, its application to Mr. Smith's claims is more difficult. Are Mr. Smith's claims, in whole or in part, tort claims viable under the FTCA, or has Mr. Smith dressed up benefits claims as tort claims in order to seek impermissible judicial review of a decision of the Secretary? See Anestis, 749 F.3d at 528 (addressing whether a veteran's claim was one "involving benefits masked in tort language"). Below, we divide Mr. Smith's FTCA claims into two types and explain why the district court can adjudicate some, but not all, of them.

49

## C.    Negligence Claims as to Approval, Authorization, and Scheduling

The first type includes Mr. Smith's claims that VA personnel were negligent in: (1) "[f]ailing to timely schedule medical appointments, diagnostic testing, and treatment"; (2) "[f]ailing to timely approve and/or authorize medical treatment that was ordered by [Mr.] Smith's treating medical providers"; (3) "[f]ailing to timely approve and/or authorize payment of" those same medical treatments; and (4) "[f]ailing to follow its own policies, procedures, and protocols for timely scheduling and approving medical appointments and authorizing payment of non-VA services."  See Compl. ¶ 38 (emphasis added).

The approval and authorization of a particular treatment or the payment thereof are quintessential benefits determinations.  So too is whether any such approval or authorization occurred in a timely manner.  In order to adjudicate these claims, the district court would first need to determine whether and to what extent Mr. Smith was eligible for and entitled to certain tests or treatments.

Accordingly, to the extent that Mr. Smith alleges that any delay in his receipt of needed medical care was a result of the VA's failure "to timely approve and/or authorize" his care or payments therefor, the district court could not review those allegations without second-guessing a decision by the VA "necessary to" a benefits

50

determination—when to grant the requested benefit.[15]  See Mehrkens, 556 F.3d at 870; Thomas, 394 F.3d at 974 ("[W]e must determine whether adjudicating [plaintiff's] claims would require the district court to determine first whether the VA acted properly in handling [his] benefits request." (quotation marks omitted)).

The same is true for purely ministerial acts of the VA's non-medical operations personnel in scheduling approved doctor visits and scans.  While the scheduling process took place after the substantive approval and authorization of Mr. Smith's doctor visits and scans, those decisions still are fairly characterized as decisions made "in the course of making [a] benefits determination[]."  See Tunac, 897 F.3d at 1202, 1204–06.  Mr. Smith's claims alleging negligence in the scheduling of his various visits and scans ultimately seek "relief for the type of administrative negligence in scheduling appointments that must be channeled through the VJRA."  Tunac, 897 F.3d at 1205–06.

As for Mr. Smith's allegations related to the VA's failure to follow its own policies, procedures, and protocols, if the district court lacks jurisdiction to review the VA's approval, authorization, and scheduling decisions, it must also lack

---

[15]We also note, as a factual matter, that it does not appear from the record before us that the delay in Mr. Smith's tests and/or treatments was really a result of some delay in the authorization or approval of benefits.  It appears that, in most instances, he was quickly deemed eligible for and entitled to the requested care.

jurisdiction to determine whether the VA followed its own internal procedures in making those decisions.

## D.    Medical Negligence or Malpractice Claims

The second type includes Mr. Smith's claims that the VA's medical personnel negligently failed to diagnose his cancer, recognize the severity of his medical condition, properly treat his cancer by immediate surgery, and to generally manage, coordinate, and monitor his medical care.

Specifically, Mr. Smith alleged that "various personnel at the VA[] were negligent in regards to [his] care and treatment" by: (1) "[f]ailing to timely act in the face of [Mr.] Smith's concerning symptoms and test results, resulting in inexcusable delay in the diagnosis, at a time when his cancer was treatable and curable"; and (2) "failing to meet the appropriate and applicable medical standards of care." Compl. ¶ 38. These allegations are strikingly similar to those over which the Ninth Circuit exercised jurisdiction in Tunac. See Tunac, 897 F.3d at 1205 (holding that allegations the VA failed to "properly order tests and/or evaluate [Tunac's] recurring lupus condition," and that the VA and its employees "caused [Tunac's] death through their wrongful acts and neglect" by failing to provide Tunac "with adequate follow-up care and treatment to monitor [his] condition" were not related to a benefits determination to the extent they "relate[d] to claims

52

of medical negligence on the part of medical professionals" (emphasis added) (quotation marks omitted)).

In other words, Mr. Smith's claims, in effect, are that the VA's medical professionals and their supporting personnel owed him a legal duty of standard medical care and breached that duty by (1) failing to recognize and diagnose the dire nature of his cancer condition, and then (2) failing to manage, coordinate, and monitor his care to ensure that he timely received the necessary and urgently needed medical treatment that he was eligible for and that had already been authorized.[16] Thus, Mr. Smith's allegations of medical negligence (in both diagnosis and treatment) do not require the district court to decide whether Mr. Smith was "'entitled to benefits,'" nor do they "require the court to 'revisit any decision made by the Secretary in the course of making benefits determinations.'" See Shinseki, 678 F.3d at 1025 (quoting Broudy, 460 F.3d at 115). The delay in diagnosis and treatment was not due to an adverse benefits decision. And there is

---

[16]Notably, too, this sort of professional negligence claim has been recognized under Georgia law. See Howard v. City of Columbus, 219 Ga. App. 569, 573, 466 S.E.2d 51, 56 (Ga. Ct. App. 1995). In Howard, the Georgia Court of Appeals held that Georgia's pleading requirements for medical malpractice were satisfied where an expert testified that medical staff at a jail failed to (1) provide the plaintiff with "timely investigation and proper health care attention necessary for the treatment of his . . . condition," (2) "recognize and treat [the plaintiff's] . . . condition," (3) "exercise those procedures and protocols critical to the providing of necessary and proper health care treatment to [plaintiff]," and (4) "recognize and properly provide medical treatment for" the plaintiff's condition. Id. (quotation marks omitted). The expert opined that it was "below the requisite standard of care for medical professionals such as defendants not to recognize, diagnose or treat a person displaying" the symptoms that the plaintiff presented with. Id. at 574, 466 S.E.2d at 56.

no adverse benefits decision, or a question necessary to that decision, for a federal court to reexamine.  See Tunac, 897 F.3d at 1202; Broudy, 460 F.3d at 115.

It is certainly true, as the government notes, that Mr. Smith acknowledged in the complaint that his cause of action "primarily" raises claims of ordinary negligence, and not professional negligence.  Compl. ¶ 43.  But this does not alter the facts that: (1) the complaint also includes claims that the VA's medical personnel failed to meet the appropriate and applicable medical standard of care; and (2) Mr. Smith attached an affidavit to the complaint from Dr. Ferris "setting forth at least one negligent act or omission claimed to exist and the factual basis for each such claim," in compliance with Georgia's pleading requirements for medical malpractice claims.  Compl. ¶ 43 (citing O.C.G.A. § 9-11-9.1).

Further, according to Dr. Ferris's deposition testimony, given Mr. Smith's initial symptoms, the standards of medical care required that the VA's medical team: (1) promptly obtain CT scans within days; (2) given the obvious findings of cancer from the CT scans, quickly diagnose cancer; and (3) perform surgery soon thereafter.  In Dr. Ferris's opinion, had the cancer been more quickly diagnosed and treated, it was more likely than not that the malignancy would have been resectable when surgery was performed.  And Nurse Rose, an expert on VA patient care coordination, identified several deficiencies with the management and coordination of Mr. Smith's medical care and treatment by the care coordination

54

team professionals, opining that "Mr. Smith's care was mismanaged from the beginning."

At the end of the day, the question—or at least a question—fairly presented by the complaint here is whether the failure to adequately and timely diagnose and treat Mr. Smith's cancer was attributable to negligence on the part of any VA medical professionals and their supporting personnel. The district court maintains jurisdiction under the FTCA to adjudicate questions of law and fact related to those claims. See 28 U.S.C. § 1346(b)(1); 38 U.S.C. § 7316(a) (stating that the FTCA provides the remedy for injury arising from the "malpractice or negligence of a health care employee" of the VA, including physicians, nurses, and "other supporting personnel").

We hasten to add, however, that whether particular medical professionals or their supporting personnel within the VA were provably negligent—that is, owed Mr. Smith a duty of care that they then violated—is not a relevant inquiry at this juncture, and we express no opinion on that question. "In the end, whether or not [Mr. Smith] has a viable 'medical malpractice claim' is irrelevant to the jurisdictional question. The district court dismissed this case on a [Rule] 12(b)(1) motion to dismiss for lack of jurisdiction." See Anestis, 749 F.3d at 528. Our focus is not on the substantive merit of Mr. Smith's allegations but, rather, the nature of those allegations. Whether any particular VA medical professional or his

55

or her supporting personnel owed a legal duty of care to Mr. Smith and whether that duty was violated is an improper question to consider at this stage in the litigation.[17]

Our recognition of Mr. Smith's claims is consistent with the way the VA's counsel apparently viewed those same claims during the administrative-exhaustion phase of this case. In both its initial denial of Mr. Smith's "Administrative Tort Claim" and its denial of reconsideration, the VA informed Mr. Smith that if he was dissatisfied with the decision, he could file suit against the United States as defendant under the FTCA. In rejecting Mr. Smith's claim, the VA clearly conceptualized that claim as one alleging negligence on the part of VA medical professionals with respect to the health care Mr. Smith received. For example, in its initial denial of Mr. Smith's claim, the VA's counsel explained that "[m]edical negligence means there was a breach in the standard of care and that breach proximately caused an injury," before concluding that no such negligence

---

[17]It appears that in certain situations the VA uses care coordinators to manage, coordinate, and monitor a veteran's medical care, and that care coordinators may be medical professionals (like nurses). For clarification, we distinguish between (1) purely ministerial acts by VA operations personnel in scheduling appointments, and (2) the overall management, coordination, and monitoring of Mr. Smith's medical care by such care coordination professionals, which allegedly includes ensuring that Mr. Smith timely received the urgent consults, tests, and treatments for which he had been approved. On the record before us, we cannot determine who (apart from Nurse Ekwueme) all of the members of Mr. Smith's care coordination team might have been. Nor can we define the scope of any legal duty VA care coordination professionals owed to Mr. Smith. Instead, we conclude only that the district court has jurisdiction to adjudicate whether any care coordination professionals or their supporting personnel had a legal duty of care to Mr. Smith, the scope and extent of that duty, and whether it was violated.

occurred.  And in its decision rejecting Mr. Smith's request for reconsideration, the VA's counsel noted that it had "a primary care physician, an oncologist and an otolaryngologist" review Mr. Smith's case.

Regardless of whether the VA's medical professionals and their supporting personnel responsible for providing, coordinating, and managing Mr. Smith's care chose to treat Mr. Smith's condition within or without the VA, they had a duty to adhere to the standard of medical care for diagnosing, treating, and managing a patient with Mr. Smith's serious condition, and Mr. Smith's complaint alleges that they did not do so.  See Tunac, 897 F.3d at 1205 ("[W]e have jurisdiction over certain claims that give rise to a 'reasonable inference' that VA medical professionals breached their duty of care." (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009)).  It defies both common sense and the plain language of the VJRA to frame Mr. Smith's case as one in which he seeks solely to have an Article III court review a benefits determination by the Secretary.[18]

---

[18]At oral argument, the government's counsel mentioned that Mr. Smith had stipulated during Dr. Puppala's deposition that Mr. Smith was not alleging medical negligence on the part of Dr. Puppala or her nurse, Patsy Pepper.  The government did not raise this point in its brief, and we need not address it here to resolve the jurisdictional issue with which we are presented. See Anestis, 749 F.3d at 528.  Whether an enforceable stipulation was made during discovery and what effect such a stipulation might have on the merits of Mr. Smith's FTCA claims for medical negligence is for the district court to address if and when it is raised in an appropriate motion.

## XI.  CONCLUSION

For the reasons discussed above, we affirm in part and reverse in part the district court's dismissal of Mr. Smith's complaint for lack of subject matter jurisdiction

**AFFIRMED** in part, **REVERSED** in part, **AND REMANDED**.